UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

QUINCY ROBERTSON,

           Petitioner,                  No. C 05-3103 PJH

        v.                         **ORDER DENYING PETITION FOR**
**WRIT OF HABEAS CORPUS**

D.L. RUNNALS, Warden,

           Respondent.

_____/

      Before the court is the petition for writ of habeas corpus filed by state prisoner, Quincy Robertson ("Robertson"), pursuant to 28 U.S.C. § 2254. Having reviewed the parties' papers, the record, and having carefully considered their arguments and relevant legal authorities, the court DENIES the petition.

## BACKGROUND

### I.    Procedural Background

      On February 7, 2001, an Alameda County Superior Court jury convicted Robertson of second degree murder, a violation of Section 187 of the California Penal Code. The jury found that on December 27, 1998, Robertson murdered Kehinde Riley ("Riley") and that during the commission of the murder, Robertson personally used and discharged a firearm which proximately caused great bodily injury to Riley. The jury also found Robertson guilty of assault with a deadly weapon, a violation of California Penal Code § 245(a)(1), against Rickey Harris ("Harris"), and that during the commission of the assault, Robertson personally used a firearm which inflicted great bodily injury on Harris.

      Robertson was sentenced to forty years to life in prison, representing fifteen years to

1   life for the murder, plus twenty-five years to life for the firearm enhancement of the murder

2   conviction, with a concurrent sentence of eight years for the assault and related

3   enhancements.  He appealed his conviction, and the California Court of Appeal affirmed on

4   June 30, 2003.  The California Supreme Court subsequently affirmed Robertson's

5   conviction in a published opinion on August 19, 2004.  On August 1, 2005, Robertson filed

6   a petition for writ of habeas corpus with this court.

7   **II.     Factual Background**

8          On the evening of December 27, 1998, the victims, Riley and Harris, along with

9   Bradley Gentry ("Gentry") and Lemont Benton ("Benton"), rode around Oakland in a car

10  driven by Benton.  At approximately 10:30 p.m., the four stopped in front of Robertson's

11  residence.  Riley and Harris approached Robertson's vehicle, which was parked outside

12  the residence, and attempted to remove its hubcaps.  Benton remained in the driver's seat

13  of his car, and Gentry stood on the street outside of Benton's car.

14         Riley and Harris successfully removed two hubcaps from Robertson's car, making

15  loud noises in the process.  Riley and Harris then proceeded to remove two more hubcaps

16  from the vehicle.  Benton and Gentry testified that they heard shots and saw Riley and

17  Harris run down the street.  Gentry jumped into the backseat of Benton's car, and the two

18  quickly drove away.

19         Riley was found dead on the street.  Harris fled the scene but suffered a gunshot

20  wound to his foot.  Benton and Gentry fled the scene by car, but shortly thereafter police

21  stopped, detained, and questioned them.   When police arrived at the scene, Robertson

22  denied any involvement in the incident.  Robertson was subsequently transported to the

23  Oakland Police Department ("OPD"). Robertson participated in two interviews, and told the

24  police that he was in his bedroom when he heard noises outside and that he emerged from

25  his residence with a gun and fired shots.

26                                    **ISSUES**

27         Robertson presents the following issues in his federal habeas petition:

28         (1) that the trial court's denial of his motion to suppress his confession violated his

                                          2

Fifth and Fourteenth Amendment rights because he had invoked his right to counsel and because his confession was coerced;

(2) that his Sixth Amendment jury trial right was violated when a jury convicted him of second degree felony murder without an express finding of malicious intent; and

(3) that the California Supreme Court's decision upholding his conviction constituted an unforeseeable and retroactive judicial expansion of the second degree felony murder rule in violation of his due process rights.

**STANDARD OF REVIEW**

The petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), so the provisions of that act apply. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997). Under the AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). It also looks to any lower court decision examined and/or adopted by the highest state court to address the merits. *See Williams v. Rhoades*, 354 F.3d 1101, 1106 (9th Cir. 2004) (because state appellate court examined and adopted some of the trial court's reasoning, the trial court's ruling is also relevant).

A state court decision is "contrary to" Supreme Court authority, falling within the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or [if the state court] decides a case

3

differently than [the Supreme] Court has on a set of materially indistinguishable facts."
*Williams v. Taylor*, 529 U.S. 362, 412-413 (2000). "'Clearly established Federal law'" under
§ 2254(d)(1) "is the governing legal principle or principles set forth by the Supreme Court at
the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 64 (2003).
This "clearly established" law "refers to the holdings, as opposed to the dicta, of [Supreme]
Court decisions as of the time of the relevant state court decision." *Id.* at 71.

"Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court
may grant the writ if the state court identifies the correct governing legal principle from [the
Supreme] Court's decisions but unreasonably applies that principle to the facts of the
prisoner's case." *Id.* at 75. However, this standard "requires the state court decision to be
more than incorrect or erroneous." *Id.* For the federal court to grant habeas relief, the
state court's application of the Supreme Court authority must be "objectively unreasonable."
*Id.* The "objectively unreasonable" standard is different from the "clear error" standard in
that "the gloss of clear error fails to give proper deference to state courts by conflating error
(even clear error) with unreasonableness." *Id.* Therefore, "[i]t is not enough that a habeas
court, in its independent review of the legal question, is left with a firm conviction that the
state court was erroneous. . . . Rather, the habeas court must conclude that the state
court's application of federal law was objectively unreasonable." *Taylor*, 529 U.S. at 75-76
(citation and internal quotations omitted).

However, when a state court decision does not articulate the rationale for its
determination or does not analyze the claim under *federal* constitutional law, a review of
that court's application of clearly established federal law is not possible. *See Delgado v.
Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* Randy Hertz & James S. Liebman, 2
*Federal Habeas Corpus Practice and Procedure* § 32.2, nn. 7-10 at 1569-77 (5th ed. 2005).
 When confronted with such a decision, a federal court must conduct an independent
review of the record and the relevant federal law to determine whether the state court's
decision was "contrary to, or involved an unreasonable application of, clearly established
federal law." *Delgado*, 223 F.3d at 979, 982.

> When a state court does not furnish a basis for its reasoning, we have no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context . . . .
>
> . . .
>
> [A]lthough we cannot undertake our review by analyzing the basis for the state court's decision, we can view it through the 'objectively reasonable' lens ground by *Williams*[, 529 U.S. 362] . . . . Federal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law . . . . Only by that examination may we determine whether the state court's decision was objectively reasonable.

*Id.* at 981-82.

As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a habeas petition by a state prisoner unless the adjudication of a claim on the merits by a state court resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d)(2). The "clearly erroneous" standard of unreasonableness that applies in determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in determining the "unreasonable determination of the facts in light of the evidence" under § 2254(d)(2). *See Torres v . Prunty*, 223 F.3d 1103, 1107-08 (9th Cir. 2000). To grant relief under 2254(d)(2), a federal court must be "left with a firm conviction that the determination made by the state court was wrong and that the one [petitioner] urges was correct." *Id.* at 1108. The relevant question under § 2254(d)(2) is whether an appellate panel, applying the normal standards of appellate review, could reasonably conclude that the state court findings are supported by the record. *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004). An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to petitioner's claim, that was properly presented and made part of the state-court record. *Taylor v. Maddox*, 366 F.3d 992, 1005 (state courts unreasonably determined the facts in failing to consider, or even acknowledge, and weigh relevant evidence of attorney's testimony corroborating that petitioner, a minor, asked to speak to a lawyer during his interrogation and gave a false confession).

5

1  This court must presume correct any factual determinations made by a state court

2  unless the petitioner rebuts the presumption of correctness by clear and convincing

3  evidence.  28 U.S.C. § 2254(e)(1).  This presumption is not altered by the fact that the

4  finding was made by a state court of appeals, rather than by a state trial court.  *Sumner v.*

5  *Mata*, 449 U.S. 539, 546-47 (1981).  A petitioner must present clear and convincing

6  evidence to overcome the presumption of correctness; conclusory assertions will not do.

7  *See Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004).

8  However, "[i]f the state courts made no finding of fact on a determinative issue or if a

9  state court finding was the product of unfair procedures or is not supported by the state

10  court record, the federal court is free to reach its own independent judgment on the

11  question."  Hertz & Liebman § 30.1, at 1492 (citations omitted).  A summary decision by a

12  state court does not "implicitly" make any factual findings in support of the decision.  *See*

13  *Fisher v. Roe*, 263 F.3d 906, 913 (9th Cir. 2001) (overruled on other grounds by *Payton v.*

14  *Woodford*, 346 F.3d 1204, 1217 n.18 (9th Cir. 2003)) (refusing to infer factual findings from

15  state court summary denial of habeas petition).

16  **DISCUSSION**

17  **I.  Robertson's Confession**

18  Before trial, Robertson moved to suppress statements that he made to the police, on

19  the grounds that the statements were obtained through coercion and were involuntary.

20  (Reporter's Transcript ("R.T.") 6); (C.T. 128-31).  In that motion, Robertson claimed he "was

21  not permitted to make any telephone calls to his family or to an attorney and was told that

22  he would not be permitted to do so until after he had given a statement."  (C.T. 129).  He

23  argued that his confession was involuntary and the result of psychological pressure.  (C.T.

24  129).  Robertson also contended that the use of false information by the police – assertions

25  that there were eye witnesses to his crime and that ballistic reports proved that a bullet

26  from his gun killed the victim – was coercive.  (C.T. 129-30). Robertson did not, however,

27  specifically argue, as he does here, that his confession was involuntary because he had

28  invoked his right to counsel.  The trial court subsequently held an evidentiary hearing at

6

1   which Robertson, along with Sergeant Ersie Joyner and Inspector Lou Landini testified.

2          At the evidentiary hearing, Robertson testified that when he was being transported to

3   the police station, he requested to use the restroom and to call his wife, but those requests

4   were denied.   (R.T. 57).   The police placed Robertson in a small room at the station, which

5   he referred to as a "closet."  (R.T. 59).   Robertson stated that the room was cold and he

6   was not offered a blanket, although he was wearing jeans, no socks, and a coat with no

7   shirt underneath.  (R.T. 59).   Robertson was not able to use the restroom before being

8   placed in the interview room.  (R.T. 60).

9          Robertson stated that officers came in and out of the room – possibly to check on

10  him – before Sgts. Bruce Brock and Ersie Joyner interviewed him.  (R.T. 61). Robertson

11  asked to use the phone before his interview with Sgts. Brock and Joyner, but he was not

12  allowed to use the phone.  (R.T. 61).

13         Robertson was then interviewed by Sgts. Brock and Joyner.  Robertson stated that

14  he did not understand he had a choice not to give the police officers a statement.  (R.T.

15  67).  At the beginning of the interview, Sgt. Brock told Robertson that he had been

16  identified as the shooter.  According to Robertson, a man was brought to the doorway of

17  the interview room at that point.  The man stated something to the effect of, "Yeah, that's

18  him." (R.T. 62).

19         Before Sgts. Brock and Joyner began taping the interview, Robertson made a

20  request to use the phone because, "My wife didn't know where I was at, my mother didn't

21  know where I was at, nobody knew where I was at." (R.T. 63).   Robertson testified that he

22  did not understand he had a choice not to speak to the police.  (R.T. 64).  When asked at

23  the hearing whether he ever asked for a lawyer, Robertson responded, "Being a person

24  that I never get – I never get in no trouble, I didn't know about a lawyer or what have you,

25  so my wife was going to call a lawyer; that was my intention to call my wife so I could really

26  know what was going on." (R.T. 63).

27         Robertson testified that he was scared.  (R.T. 65).   After completing his interview

28  with Sgts. Brock and Joyner, Robertson was allowed to use the phone, at which time he

spoke to his wife and mother. (R.T. 65). When Robertson was asked at the hearing whether he called an attorney once he was permitted to use the phone, Robertson responded, "She called – she arranged that. She called the lawyer Robert Beles." (R.T. 65). Robertson stated that he asked Sgt. Brock at some point if he had ever heard of Beles, and Sgt. Brock allegedly responded that he was unfamiliar with the name. (R.T. 68).

Robertson was subsequently interviewed by Alameda County Inspector Lou Landini and Alameda Deputy D.A. Joanie Leventis. (R.T. 66-67). While he was being interviewed by Inspector Landini and D.A. Leventis, Robertson asked to use the phone again. (R.T. 68).

During his interviews, Robertson admitted that he was provided chicken nuggets, fries, and a peanut butter cookie to eat, and a soda to drink. (R.T. 70). He stated that no one threatened or used any type of physical force against him. (R.T. 70, 72). Robertson ultimately gave the police written consent to search his house. (R.T. 90).

Sgt. Joyner testified at the evidentiary hearing that before he and Sgt. Brock interviewed Robertson at the police station, Sgt. Brock read Robertson his *Miranda* rights using a standard OPD statement form. (R.T. 11-12). Robertson stated he understood his rights and would answer questions. (R.T. 11-12). Robertson signed his initials on the OPD standard form indicating waiver of his rights. (R.T. 12).

Robertson initially gave an account of being in front of his residence, seeing someone tampering with his car, and of an unknown gunman shooting into a crowd. (R.T. 12-13). Robertson then gave a different account of what transpired. (R.T. 14). In this second account, Robertson admitted to having a gun, seeing some people tampering with his car, and shooting the gun several times. (R.T. 14).

Sgt. Joyner testified that Brock re-*Mirandized* Robertson once the interview was recorded, (R.T. 14), and that Robertson did not ask for an attorney during the interview or at any other time. (R.T. 17). Robertson did ask to use the phone to call his family, but Sgt. Brock told Robertson he could use the phone to call his family after he finished giving a

statement. (R.T. 17). According to Sgt. Joyner, the reason for denying Robertson's request to use the phone was because Sgts. Brock and Joyner did not want Robertson to instruct someone to destroy evidence. (R.T. 32). Robertson was eventually allowed to use the phone at least three times that day. (R.T. 18).

Inspector Landini testified that he and D.A. Leventis went to the Oakland Police station to interview Robertson regarding the murder of Riley. (R.T. 40). Inspector Landini and D.A. Leventis introduced themselves to Robertson as representatives of the District Attorney's Office. (R.T. 44). Prior to interviewing Robertson about the incident, Inspector Landini read Robertson his *Miranda* rights using a "*Miranda* card." (R.T. 42). Robertson stated he understood his rights and would speak to them. (R.T. 43).

During the interviews, Robertson did not complain of any mental or physical impairments, and also did not appear to have any noticeable injuries, nor did he complain of any. (R.T. 46). Inspector Landini testified that he never made any promises to Robertson to get him to make a statement, and that he never threatened Robertson, or used any type of force against Robertson. (R.T. 46). According to Landini, Robertson did not ask to see an attorney or to stop the interview. (R.T. 46-47). Landini testified that the interview lasted approximately three hours. (R.T. 41, 45).

At the conclusion of the evidentiary hearing, the superior court denied Robertson's motion to suppress on the record without explanation. (R.T. 92).

**A.    Invocation of Right to Counsel**

Robertson argues that he made an unambiguous request for an attorney before he confessed to the police. He claims that any statements made after his request were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments, and that the trial court erred in admitting such statements at trial.

On appeal, the state appellate court held that Robertson had waived his invocation of counsel argument by failing to raise it at trial. Pet. Exh. C at 33. According to the court, Robertson's "written motion did not refer to any request for an attorney; it argued that his statements were coerced and involuntary because of the psychological pressure to which

he was subjected." Pet. Exh. C at 33. The court rejected Robertson's argument that the facts set forth in his motion in limine established that the police told him he could call an attorney only after giving a statement. *Id.* at 34. The court reasoned, "That the prosecution might have anticipated an invocation-of-counsel objection did not obviate the need to raise one, and we are not authorized to reverse on an evidentiary ruling the trial court was not called upon to make." Pet. Exh. C at 34 (citation omitted).

The court nevertheless reached the merits of the claim, though, and found that the record did not support an invocation of counsel argument. *Id.* It noted that although Robertson initially claimed he told the police he wanted to call his family so they could get him a lawyer, he later admitted he had not thought to call an attorney and did not remember telling the police he wanted one. *Id.* The court held that the trial court was permitted to rely on Sgt. Joyner's testimony that Robertson never asked to call or see an attorney. *Id.* In the court's opinion, the trial court would have rejected Robertson's argument that he invoked counsel, had he raised it. *Id.* at 35. The California Supreme Court subsequently upheld Robertson's conviction without referring to his invocation of counsel argument. *People v. Robertson*, 34 Cal. 4th 156 (Cal. 2004); Pet. Exh. D.

The state similarly argues before this court that Robertson's invocation of counsel argument is procedurally defaulted for failure to raise the argument at trial. However, because this court concludes that the state appellate court's decision on the merits was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, the court need not decide the procedural default issue.

In *Miranda v. Arizona*, the United States Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. 384 U.S. 436 (1966). *Miranda* requires that a person subjected to custodial interrogation be advised that he has the right to remain silent, that statements made can be used against him, that he has the right to counsel, and that he has the right to have counsel appointed. *Id.* at 444. These warnings must precede any custodial

10

interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id.* at 444. There is no per se rule requiring that a suspect be re-advised of his rights when he is re-interrogated after the passage of a certain amount of time. *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1130 (9th Cir. 2005).

Once properly advised of his rights, an accused may waive them voluntarily, knowingly, and intelligently. *See Miranda*, 384 U.S. at 444. A valid waiver of *Miranda* rights depends upon the totality of the circumstances, including the background, experience, and conduct of the defendant. *See United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986). To solicit a waiver of *Miranda* rights, a police officer need neither use a waiver form nor ask explicitly whether the defendant intends to waive his rights. *See Terrovona v. Kincheloe*, 912 F.2d 1176, 1179 (9th Cir. 1990). The waiver need not be express so long as the totality of the circumstances indicates that the waiver was knowing and voluntary. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

The state must prove waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168-69 (1986). There is a presumption against waiver. *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998). To satisfy its burden, the state must introduce sufficient evidence to establish that under the totality of the circumstances, the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A showing that the defendant knew his rights generally is sufficient to establish that he knowingly and intelligently waived them. *See, e.g.*, *Paulino v. Castro*, 371 F.3d 1083, 1086-87 (9th Cir. 2004) (statement that suspect understood his rights and wanted to talk to officer sufficient to waive right to counsel). And although the burden is on the state to prove voluntariness, a waiver cannot be held involuntary absent official compulsion or coercion. *See Connelly*, 479 U.S. at 170; *see generally Derrick v. Peterson*, 924 F.2d 813, 820-24 (9th Cir. 1990) (explaining waiver analysis in detail).

A suspect who has expressed a desire to have counsel present during custodial

1   interrogation is not subject to further interrogation by the authorities until counsel is made

2   available to him. *See Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). However,

3   authorities may continue the interrogation if the suspect does not clearly request an

4   attorney. *See Davis v. United States*, 512 U.S. 452, 459-62 (1994) (suspect must

5   unambiguously request counsel; "Maybe I should talk to a lawyer" insufficient); *United*

6   *States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) (defendant's statement "[b]ut,

7   excuse me, if I am right, I can have a lawyer present . . . through all this, right?" does not

8   constitute unambiguous invocation of right to counsel); *Alvarez v. Gomez*, 185 F.3d 995,

9   998 (9th Cir. 1999) (suspect's repeated questions about the immediate availability of an

10  attorney constituted an unequivocal request for counsel); *United States v. Cheely*, 36 F.3d

11  1439, 1448 (9th Cir. 1994) (in combination, defendant's written acknowledgment of rights,

12  refusal to sign waiver, and explanation that attorney did not want him to talk to police

13  amount to invocation of rights under *Edwards*); *Paulino*, 371 F.3d at 1087-88 (defendant's

14  statements, "Where's my attorney?" and "You mean it's gonna take him long to come?,"

15  plus failure to fill in form waiving right to counsel was not an unequivocal demand for

16  counsel); *Clark*, 331 F.3d at 1070 (statements that "I think I would like to talk to a lawyer"

17  and "should I be telling you, or should I talk to an attorney?" were not unambiguous

18  requests for counsel).

19       Likewise, interrogation may continue if the accused voluntarily initiates further

20  communication. *See Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983). Officers are

21  not required to clarify an ambiguous statement. *See Davis*, 512 U.S. at 461-62. By

22  contrast, continued responses to questions from interrogators after a suspect invokes his

23  right to have counsel present does not constitute a waiver of the right. *See Alvarez,*185

24  F.3d at 998.

25       Here, Robertson was required to clearly request an attorney in order to invoke his

26  right to counsel and prevent further police interrogation. *Davis*, 512 U.S. at 459.

27  Robertson testified that he asked to use the telephone at least three times – while being

28  transported to the police station, (R.T. 57), before his interview with Sgts. Brock and

Joyner, (R.T. 61), and during his interview with Inspector Landini and D.A. Leventis, (R.T. 68) – because, "nobody knew where I was at." (R.T. 63). However, Robertson never testified that he asked to speak to an attorney, and Sgt. Joyner and Inspector Landini both testified that Robertson never asked for an attorney. (R.T. 17, 46-47). Rather, Robertson stated, "Being a person that I never get – I never get in no trouble, I didn't know about a lawyer or what have you, so my wife was going to call a lawyer; that was my intention to call my wife so I could really know what was going on." (R.T. 63). Moreover, Robertson signed the OPD form indicating that he waived his rights, including to speak to an attorney before answering questions. (R.T. 63).

While Robertson may have *intended* to call his wife so she could obtain an attorney, he did not voice this. The only time Robertson mentioned an attorney was when he asked Sgt. Brock *after* the interview whether Brock had ever heard of Beles. (R.T. 68-69). The police officers were not required to clarify why Robertson wanted to call his wife, or to clarify whether he mentioned Beles because he wished to speak to him. *See Davis*, 512 U.S. at 461-462.

For these reasons, the court concludes that the state court of appeal's decision on the issue was neither an unreasonable application of clearly established federal law, nor an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

**B.     Coerced Confession**

Robertson also argues that his confession was involuntary and coerced because of the inhumane conditions of his detention and the use of trickery by the police.

The California Court of Appeal rejected Robertson's arguments and concluded that his statements were indeed voluntary. It accepted Joyner's and Landini's testimony that no promises were made to induce Robertson's statements, and held that any deception was insufficient to render Robertson's statements involuntary. The court further rejected Robertson's argument that he was held under inhumane conditions for an inordinate amount of time.

1    Involuntary confessions in state criminal cases are inadmissible under the

2    Fourteenth Amendment.  *Blackburn v. Alabama*, 361 U.S. 199, 205 (1960).  The

3    voluntariness of a confession is evaluated by reviewing both the police conduct in

4    extracting the statements and the effect of that conduct on the suspect.  *Miller v. Fenton*,

5    474 U.S. 104, 116 (1985).  Absent police misconduct causally related to the confession,

6    there is no basis for concluding that a confession was involuntary in violation of the

7    Fourteenth Amendment.  *Connelly*, 479 U.S. at 167.

8    To determine the voluntariness of a confession, the court must consider the effect

9    that the totality of the circumstances had upon the will of the defendant.  *Schneckloth v.*

10   *Bustamonte*, 412 U.S. 218, 226-27 (1973).  "The test is whether, considering the totality of

11   the circumstances, the [state] obtained the statement by physical or psychological coercion

12   or by improper inducement so that the suspect's will was overborne."  *United States v.*

13   *Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373

14   U.S. 503, 513-14 (1963)); *see*, *e.g.*, *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810-

15   11 (9th Cir. 2003) (officer did not undermine plaintiff's free will where interrogation lasted for

16   eight hours and officer did not refuse to give break for food and water, officer suggested

17   cooperation could lead to treatment rather than prison, officer made statement he had put

18   people in prison for similar conduct, officer denied plaintiff's request to call therapist, and

19   plaintiff diagnosed with mental disorder and taking bi-polar medication); *Clark v. Murphy*,

20   331 F.3d 1062, 1073 (9th Cir. 2003) (holding that state court's determination that

21   interrogation was non-coercive, where suspect was interrogated over five-hour period in

22   six-by-eight foot room without water or toilet (but never requested water or use of a toilet),

23   was objectively reasonable application of *Schneckloth*); *United States v. Okafor*, 285 F.3d

24   842, 846-47 (9th Cir. 2002) (customs agent's statements to defendant that he would be

25   subject to 10-20 years in prison and it would be to his benefit to cooperate with authorities,

26   as well as customs agent's statement that he would let the government know if defendant

27   cooperated, did not render subsequent confession involuntary).

28   A voluntary statement must be the product of an essentially free and unconstrained

choice by its maker.  *Henry v. Kernan*, 197 F.3d 1021, 1026-27 (9th Cir. 1999).  But again,

"coercive police activity is a necessary predicate to the finding that a confession is not

'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment."

*Connelly*, 479 U.S. at 167.  A confession is only involuntary if the police use coercive

activity to undermine the suspect's ability to exercise his free will.  *Derrick*, 924 F.2d at 818.

Personal characteristics of the defendant are therefore irrelevant absent proof of coercion.

*Id.*

Encouraging a suspect to tell the truth is not coercion.  *Amaya-Ruiz v. Stewart*, 121

F.3d 486, 494 (9th Cir. 1997).  Nor is it coercive to recite potential penalties or sentences,

including the potential penalties for lying to the interviewer.  *United States v. Haswood*, 350

F.3d 1024, 1029 (9th Cir. 2003).   Moreover, deception does not render a confession

involuntary.  *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993); *Amaya-Ruiz* 121

F.3d at 495 ("Misrepresentations linking a suspect to a crime or statements which inflate

the extent of evidence against a suspect do not necessarily render a confession

involuntary").  Thus, false police statements to a defendant that a witness had identified the

defendant, *Amaya-Ruiz*, 121 F.3d at 495, and that the defendant's accomplice had

confessed, *Frazier v. Cupp*, 394 U.S. 731, 737-39 (1969), did not render the defendant's

confession involuntary.

Voluntariness of a confession is not a factual issue entitled to a presumption of

correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent

consideration in a federal habeas corpus proceeding.  *Miller v. Fenton*, 474 U.S. 104, 110

(1985).  A federal habeas court must review de novo the state court's finding that a

confession was voluntarily given.  *Derrick*, 924 F.2d at 818.  But a state court's subsidiary

factual conclusions are entitled to the presumption of correctness.  *Rupe v. Wood*, 93 F.3d

1434, 1444 (9th Cir. 1996) (deferring to state appellate court's conclusion that challenged

statement did not constitute threat or promise).

Review of the record demonstrates that the California Court of Appeal's conclusion

on this issue was neither contrary to, nor an unreasonable application of, clearly

established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented.  First, the conditions under which Robertson was held were not so inhumane as to constitute coercion.  While Robertson alleges he was deprived of sleep, food, and access to the bathroom and telephone, he nevertheless conceded that he was given some nuggets, fries, and a peanut butter cookie to eat, a soda to drink, and was eventually allowed to use the telephone.  (R.T. 16, 70); *cf. Davis v. State of N.C.*, 384 U.S. 737 (1966) (coerced confession where defendant held for 16 days with little food or water, causing him to lose 15 pounds).  Moreover, the length of Robertson's interrogation was not so long to be coercive, since Robertson's two interrogations – one with Sgts. Brock and Joyner and one with Inspector Landini and D.A. Leventis – lasted approximately three hours each.  *Compare Cunningham*, 345 F.3d at 810-11 (confession after eight hour interrogation not involuntary), *with Turner v. Commonwealth of Pa.*, 338 U.S. 62 (1949) (confession involuntary where defendant held for five days of custody and subject to intermittent interrogation totaling 23 hours).

Furthermore, Robertson's subjective fears and beliefs that he would be beaten or falsely accused and had no choice to speak to the police are insufficient to prove that the police actually used coercive tactics.  Indeed, Robertson admitted that no one threatened him or used any type of physical force against him.  (R.T. 70, 72).  In light of the Ninth Circuit's failure to find involuntary confessions in much more severe cases, these circumstances do not suggest that Robertson's confession was coerced and involuntary.  *See*, *e.g.*, *Cunningham*, 345 F.3d at 810-11 (eight hour interrogation with no break for food or water).

Additionally, the officers' use of deception did not render Robertson's confession involuntary.  While the police used false means to lead Robertson to believe he had been identified as the shooter, the state appellate court determined that such deception was not reasonably likely to produce an untrue statement.  Pet. Exh. C at 36.  The Supreme Court and Ninth Circuit have similarly held that such tactics are not coercive.  *See, e.g., Frazier*, 394 U.S. at 739; *Amaya-Ruiz*, 121 F.3d at 495.  Robertson's subjective belief that the

16

police would not accept any other explanation of the events is therefore unfounded. The trial court was free to accept: (1) Sgt. Joyner's and Inspector Landini's testimony that no promises were made to induce Robertson's confession; (2) Sgt. Brock's testimony that Robertson appeared to understand inquiries made to him, responded to inquiries appropriately, and appeared coherent; and (3) Robertson's signature on the OPD form waiving his rights. Considering the totality of the circumstances, Robertson's confession appears to have been "the product of an essentially free and unconstrained choice." *Henry*, 197 F.3d at 1026-27.

## II. Whether Robertson's Due Process and Fair Trial Rights were Violated when the Jury Instructions Omitted an Alleged Requisite Element for Conviction of Second Degree Felony Murder

Robertson also contends the trial court's failure to instruct the jury on the element of malice required for second degree murder violated the Sixth Amendment and his due process rights. He argues that the trial court failed to instruct the jury that grossly negligent discharge of a firearm merges with the homicide where that felony is an integral part of and included in fact within the homicide. Therefore, according to Robertson, the jury instructions relieved the prosecution of the burden of proving malice aforethought beyond a reasonable doubt.

### A. Background

Robertson's jury was instructed on the elements of murder as follows:

Defendant is charged in Count 1 of having committed the crime of murder, a violation of Penal Code section 187.
Every person unlawfully who kills a human being with malice aforethought or during the commission or attempted commission of Penal Code section 246.3, a felony inherently dangerous to human life, is guilty of the crime of murder, in violation of section 187.
A killing is unlawful if it was neither justifiable nor excusable. In order to prove this crime each of the following elements must be proved:
1. A human being was killed;
2. The killing was unlawful;
3. The killing was done with malice aforethought or occurred during the commission or attempted commission of Penal Code Section 246.3, a felony inherently dangerous to human life.

C.T., Ex.1(B) at 322.

The jury was further instructed on second degree felony murder:

> The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs . . . as the direct causal result of the crime of Penal Code section 246.3 is murder of the second degree when the perpetrator had the specific intent to commit that crime. The specific intent to commit Penal Code section 246.3 and the commission or attempted commission of such crime must be proved beyond a reasonable doubt.

C.T., Ex.1(B) at 327.

The court also instructed the jury regarding the elements of grossly negligent discharge of a firearm under California Penal Code § 246.3 ("§ 246.3"):

> Every person who willfully and unlawfully discharges a firearm in a grossly negligent manner which could result in injury or death to a person is guilty of a violation of Penal Code section 246.3, a crime. In order to prove this crime each of the following elements must be proved: 1. a person willfully and unlawfully discharged a firearm; 2. the person who discharged the firearm did so in a grossly negligent manner; and 3. the discharge of the firearm was done in a manner which could result in injury or death to a person.

C.T., Ex.1(B) at 328.

Finally, the jury was instructed on the specific intent necessary for a conviction of § 246.3:

> 'Gross negligence' means conduct which is more than ordinary negligence. Ordinary negligence is the failure to exercise ordinary or reasonable care. 'Gross negligence' refers to a negligent act which is aggravated, reckless or flagrant and which is such a departure from what would be the conduct of an ordinarily prudent, careful person under the same circumstances as to be contrary to a proper regard for human life or a danger to human life or to constitute indifference to the consequences of those acts. The facts must be such that the consequences of the negligent act could reasonably have been foreseen and it must appear that the death or danger to human life was not the result of inattention, mistaken judgment or misadventure but the natural and probable result of an aggravated, reckless or flagrantly negligent act.

*Id.* at 320.

On direct appeal, the California Court of Appeal held that the trial court erred in giving the jury a second degree felony-murder instruction based on the underlying grossly negligent discharge of a firearm offense. *People v. Robertson*, 1 Cal. Rptr. 3d 353, 367 (Cal. Ct. App. 2003). It concluded that the merger doctrine precluded the underlying offense from serving as a predicate offense for felony murder, but held that the instructional error was harmless. *Id.* In arriving at this conclusion, the court surveyed California Supreme Court precedent and determined that "[t]he central consideration in resolving the

merger issue is whether most homicides result from grossly negligent discharge of a firearm in violation of section 246.3." *Id.* at 366. According to the court, "[i]f allowing section 246.3 violations to serve as predicate offenses may result in the felony-murder rule's application to a great majority of homicides, then the violations and resulting homicides must be deemed to merge, to prevent the rule from 'effectively eliminating the requirement of malice' in contravention of legislative intent." *Id.* (citing *People v. Hansen*, 9 Cal. 4th 300, 314 (Cal. 1994)).

The court reasoned that in a majority of homicides, second degree felony murder would arise from a violation of § 246.3 where a gun is intentionally fired and a person is killed by the shot. *Robertson*, 1 Cal. Rptr. 3d at 367. "Therefore, to preserve malice as an issue in most homicide cases in accordance with legislative intent, [the court held] that the merger doctrine preclude[d] a violation of section 246.3 from serving as a predicate offense for a charge of felony murder." *Id.* The court distinguished the most recent California Supreme Court case on the issue of merger, *People v. Hansen*, stating, "the firearm offense in that case, malicious and willful discharge of a firearm at an inhabited dwelling, occurs in relatively few homicides, whereas the one here occurs in a great majority of them." *Id.* (citing *Hansen*, 9 Cal. 4th at 309).

Subsequently, the California Supreme Court disagreed with the California Court of Appeal, and held that the jury instructions used by the trial court were not erroneous. *People v. Robertson*, 34 Cal. 4th 156, 169 (Cal. 2004). It reasoned that violations of § 246.3 that result in death may constitute second degree felony murder because "a killer who violates [§ 246.3] is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it." *Id.* (internal quotations omitted). The California Supreme Court concluded that the court of appeal overlooked an underlying justification for the felony murder rule, stating:

> when the danger to human life is so foreseeable to reasonable persons that the felony has been designated as one that is inherently dangerous to human life, the very foreseeability of this danger has led courts to conclude that the defendant's claim that he or she 'didn't mean to do it' should not be heard, once the mental state necessary to the underlying offense has been

19

1     proved.

2 *Id.* at 172.  Turning to the issue of merger, the California Supreme Court

3 concluded:

4         that the merger doctrine does not preclude application of the felony-murder
        rule under the facts of the present case and that the trial court did not err by

5         instructing the jury concerning the second degree felony-murder rule and
        the predicate offense of discharging a firearm in a grossly negligent manner.

6

7 *Id.* at 173.

8     **B.**     **California Second Degree Felony Murder Rule**

9     Under California law, murder is an unlawful killing committed with malice

10 aforethought.  Cal. Pen. Code § 187(a) (2007).  First degree murder is perpetrated by

11 specified means or is willful, deliberate, and premeditated.  Cal. Pen. Code § 189 (2007).

12 Additionally, first degree murder is also found where a homicide occurs during the

13 commission of certain felonies.  *Id.*  In contrast, second degree murder under California law

14 is an unlawful killing with malice aforethought absent the elements necessary for first

15 degree murder.  *Hansen*, 9 Cal. 4th at 307.

16     The second degree felony murder rule in California exists as a matter of judicial

17 creation, and occurs when an unlawful killing takes place during the commission of a felony

18 that is not specifically enumerated in California Penal Code § 189, but is nevertheless

19 deemed inherently dangerous to human life by the state courts.  *Hansen*, 9 Cal. 4th at 308.

20 In *Hansen*, the California Supreme Court noted that the felony-murder doctrine eliminates

21 the need for proof of malice in connection with both first and second degree felony murder,

22 thereby rendering irrelevant the presence or absence of actual malice.  *Id.*  California courts

23 perform separate analyses for deciding whether a felony is inherently dangerous and

24 whether an inherently dangerous felony "merges" with the resulting homicide.  *Id.* at 308-

25 311.

26     In *People v. Ford,* the California Supreme Court held that a homicide caused by the

27 commission of a felony inherently dangerous to human life "constitutes at least second

28 degree murder."  60 Cal. 2d 772, 795 (Cal. 1964).  A felony is deemed inherently

dangerous if, when viewed in the abstract, it "cannot be committed without creating a substantial risk that someone will be killed," *People v. Burroughs*, 35 Cal. 3d 824, 833 (Cal. 1984), or it carries a "high probability that death will result."   *People v. Patterson*, 49 Cal. 3d 615, 627 (Cal. 1989).

In *People v. Ireland*, the California Supreme Court first applied the merger doctrine, holding "that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." 70 Cal. 2d 522, 539 (Cal. 1969) (emphasis in original).  In *Ireland*, the defendant was convicted of second degree felony murder based on an assault with a deadly weapon for the shooting death of his wife.  *Id.* at 525-527.  The *Ireland* court reasoned that the jury instructions were improper because they precluded the jury from considering the element of malice aforethought in all felonious assaults - "a category which includes the great majority of all homicides,"  thus relieving the prosecution from proving malice aforethought in the great majority of homicides.  *Id.* at 539.  To avoid this result, the *Ireland* court concluded that the felonious assault was an integral part of the homicide, thus merging with the homicide, and thereby requiring the prosecution to prove malice where a homicide occurs as a result of a felonious assault.  *Id.* at 540.

The merger test in *Ireland* was called into question by the California Court of Appeal in *People v. Taylor*, 11 Cal. App. 3d 57 (Cal. Ct. App. 1970).  In *Taylor*, the defendant was convicted of second degree felony murder for the felony of supplying heroin which resulted in the overdose death of the recipient.  *Id.*  The *Taylor* court suggested that the *Ireland* test potentially encompassed all felonies closely related to a homicide.  *Id.* at 60.  Looking to New York law, the *Taylor* court found the merger doctrine inapplicable where the felony was committed with a "collateral and independent felonious design," that is, the intent of the felony was independent from an intent to cause the injury that caused the death.  *Id.* at 61. The *Taylor* court reasoned that the California Supreme Court's decision in *Ireland* did not intend to entirely abolish second degree felony murder.  Rather, the *Taylor* court assumed

that circumstances must still exist where an inherently dangerous felony directly caused a homicide, but yet the merger doctrine does not preclude application of the felony murder rule. *Id.* Thus, *Taylor* concluded that *Ireland* did not preclude application of the felony murder rule where the felony of furnishing heroin had an independent felonious design from the resulting homicide. *Id.* at 64.

In *People v. Mattison*, the California Supreme Court subsequently adopted the *Taylor* court's "collateral and independent felonious design" test, holding that a jury instruction on second degree felony murder was proper. 4 Cal. 3d 177, 185 (Cal. 1971). In *Mattison*, the defendant was convicted of second degree murder for the predicate felony of furnishing a poison, methyl alcohol, which resulted in the death of the recipient. *Id.* at 180. The *Mattison* court reasoned that the facts were "virtually indistinguishable" from *Taylor*, and that furnishing the poison had a collateral and independent design from the resulting homicide. Accordingly, the *Mattison* court held that the jury instruction on second degree felony murder was proper. *Id.* at 185.

In 1994, in *People v. Hansen,* the California Supreme Court held for the first time that the malicious and willful discharge of a firearm at an inhabited dwelling in violation of § 246.3 was an inherently dangerous felony. 9 Cal. 4th at 308-311. In *Hansen*, after trying and failing to purchase forty dollars worth of methamphetamine, the defendant shot several bullets into an occupied residence, killing a teenage girl inside. *Id.* at 305-306. On appeal, the defendant argued that the trial court erred by instructing the jury on second degree felony murder because the felony merged with the resulting homicide. *Id.* The *Hansen* court held that the merger doctrine did not apply to violations of § 246.3. *Hansen*, 9 Cal. 4th at 316. It agreed with the *Taylor* court, in "reject[ing] the premise that *Ireland*'s 'integral part of the homicide' language constitut[ed] the crucial test in determining the existence of merger." *Id.* at 314. However, the *Hansen* court declined to adopt the language in *Taylor* "as the critical test determinative in all cases . . . that the rationale for the merger doctrine does not encompass a felony 'committed with a collateral and independent felonious design.'" *Id.* at 315 (quoting *Taylor*, 11 Cal. App. 3d at 63). Instead, the *Hansen* court

22

1  reasoned that such a test creates an anomalous result by subjecting a felon who acts with

2  a purpose other than to inflict injury to "greater criminal liability for an act resulting in death

3  than a person who actually intends to injure the person of the victim." *Id.*

4      Here, in Robertson's case, the California Supreme Court determined that "[a]lthough

5  the collateral purpose rationale may have its drawbacks in some situations, we believe it

6  provides the most appropriate framework to determine whether, under the facts of the

7  present case, the trial court properly instructed the jury." *Robertson*, 34 Cal. 4th at 171.

8  Because Robertson's asserted purpose was to frighten away the men who were

9  burglarizing his vehicle, the state supreme court found that Robertson's "discharge of the

10  firearm was undertaken with a purpose collateral to the resulting homicide, rendering the

11  challenged instruction permissible." *Id.*

12      The California Supreme Court looked to the deterrence rationale underlying the

13  felony murder rule, stating, "the second degree felony-murder rule is intended to deter both

14  carelessness in the commission of crime and the commission of the inherently dangerous

15  crime itself." *Id.* The court believed the deterrence purpose of the rule was served in

16  applying it to violations of § 246.3 because "it must be reasonably foreseeable to such a

17  defendant that the intentional discharge of a firearm could result in injury or death." *Id.*

18  Additionally, the court asserted a further policy rationale for applying the felony murder rule

19  to violations of § 246.3 - the foreseeability of danger posed to human life by the grossly

20  negligent discharge of a firearm. *Id.* at 173.

21      In addition, the state supreme court disagreed with the court of appeal's assertion

22  that the deterrent purpose of the felony murder rule was not served by the collateral

23  purpose rationale where the underlying felony is based on gross negligence. To the

24  contrary, the California Supreme Court concluded that application of the felony murder rule

25  for violations of § 246.3 "deter[s] persons from discharging a firearm in a grossly negligent

26  manner that could result in injury." *Id.* at 172. It also disagreed with the court of appeal's

27  conclusion that applying the merger doctrine avoided absurd results, stating:

28      the result predicted by the Court of Appeal majority and by defendant

23

1    will not occur in any of the many homicide cases in which a firearm is
2    not used.  Nor will it occur when the defendant's claim that he or she
     did not intend to kill or injure the victim arises in the context of a
3    defense to the section 246.3 charge involving the discharge of
     firearm with the intent to frighten away an intruder as a reasonable
4    response to an imminent threat to self, others, or property.  Nor will it
     occur if the defendant's defense to the section 246.3 charge is that
5    the discharge itself was unintentional.

*Id.* at 172.

The state supreme court further rejected the court of appeal's concern that application of the felony murder rule to violations of § 246.3 would produce an anomalous result, such that defendants who admit an intent to kill may have a better chance of being convicted of the lesser offense of voluntary manslaughter than defendants who claim to lack such an intent.  *Id.* (citing *Robertson*, 109 Cal. App. 4th at 368-369).  The court concluded that the anomaly is no greater for violations of § 246.3 than any other inherently dangerous felony.  *Id.* at 172.  Thus, the California Supreme Court ultimately held that the merger doctrine did not preclude application of the felony murder rule to the facts of Robertson's case.  *Id.* at 172.

### C.   Analysis

#### 1.   The California Supreme Court was Entitled to Define the Elements of Second Degree Felony Murder

Claims that a state court erred in interpreting state law are not cognizable on federal habeas review.  *See, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir. 2006) (claim that state supreme court misapplied state law or departed from its earlier decisions does not provide a ground for habeas relief); *Franklin v. Henry*, 122 F.3d 1270, 1272-73 (9th Cir. 1997) (court was bound by state court finding that a violation of state law had occurred, but still had to consider whether the violation amounted to a federal constitutional error).  Federal courts generally are bound by a state court's construction of state laws, *see, e.g.*, *Melugin v. Hames*, 38 F.3d 1478, 1487 (9th Cir. 1994) (federal court bound by Alaska Court of Appeals' interpretation and decision that state statute was properly applied to petitioner's conduct), except when it appears that its interpretation is an obvious subterfuge to evade the consideration of a federal issue.  *See Peltier v. Wright*, 15 F.3d 860, 862 (9th Cir. 1994);

*see also Little*, 449 F.3d at 1083 (petitioner might have been able to show that state supreme court's interpretation and application of state law was constitutional error if it constituted "a fundamental defect which inherently resulted in a complete miscarriage of justice," or "exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent"). Federal courts must presume that state courts follow the law, even when they fail to so indicate. *See Poland v. Stewart*, 117 F.3d 1094, 1101 (9th Cir. 1997); *Jeffers v. Lewis*, 38 F.3d 411, 415 (9th Cir. 1994) (en banc); *see also Beam v. Paskett*, 3 F.3d 1301, 1306 (9th Cir. 1993) (where state supreme court has statutory notice of the types of errors for which it is required to examine the record, it is presumed that it has carried out its statutory obligations even when it does not expressly indicate in its opinion that it has done so).

Recently, in *Sarausad v. Porter*, the Ninth Circuit held that there was "a 'reasonable likelihood' that the jury misapplied ambiguous jury instructions, thereby relieving the State of its burden [to prove] an element of the crimes which Sarausad was charged." 479 F.3d 671, 694 (9th Cir. 2007), *vacated in part on denial of rehearing en banc by Sarausad v. Porter*, 503 F.3d 822 (9th Cir. 2007). The Ninth Circuit "further conclude[d] that the state court's decision was an 'unreasonable application' of the Supreme Court's holdings in *In re Winship* [397 U.S. 358, 364 (1970)], *Sandstrom v. Montana* [442 U.S. 510, 521 (1979)], and *Estelle v. McGuire* [502 U.S. 62, 72 (1991)]." *Id.* (citing 28 U.S.C. § 2254(d)(1)). In *Sarausad*, the defendant was convicted of second degree murder and attempted second degree murder based on accomplice liability under Washington state law for driving a car in which a passenger shot and killed a young woman and wounded a young man. *Id.* at 675. The Ninth Circuit determined that the jury instructions were ambiguous because they lacked "an explicit statement that an accomplice must have knowledge of the actual crime the principal intends to commit."[1] *Id.* at 690. The ambiguity arose because "a crime . . . could mean 'the

---

[1]The relevant instructions were: "[y]ou are instructed that a person is guilty of *a crime* if it is committed by the conduct of another person for which he is legally accountable. A person is legally accountable for the conduct of another person when he is an accomplice of such other person in the commission of *the crime*." *Sarausad*, 479 F. 3d at 690 (emphasis in

25

crime' actually committed by the principal . . . , or it could mean 'the crime' the accomplice had knowledge the principal intended to commit." *Id.* at 690. The Ninth Circuit concluded there was a "reasonable likelihood" the jury misapplied the ambiguous jury instructions, the result of which relieved the state of the burden of proving an element of the crime, thus constituting an "unreasonable application" of established Supreme Court precedent.[2] *Id.* at 694.

Here, the California Supreme Court determined that the jury instructions on second degree felony murder were proper, and that the merger doctrine did not preclude application of the felony murder rule. *Robertson*, 34 Cal. 4th at 173. In the State of California, the second degree felony murder rule and merger doctrine are creations of common law. *Hansen*, 9 Cal. 4th at 308. The California Supreme Court has the final word on interpretations of law of the State of California. Thus, it is not "an obvious subterfuge to evade consideration of a federal issue" for the California Supreme Court to decide that grossly negligent discharge of a firearm may serve as a predicate offense for application of the felony murder rule and that the merger doctrine does not preclude such application under the law of California. *See Peltier*, 15 F.3d at 862. Additionally, the California Supreme Court's decision in *Robertson* did not give rise to "a fundamental defect which inherently resulted in a complete miscarriage of justice" nor did it give rise to an "exceptional circumstance[] where the need for the remedy afforded by the writ of habeas corpus is apparent" because the decision applied a state common law doctrine interpreted by the highest court of the state. *Little*, 449 F.3d at 1083.

---

original). Further, the instructions stated "[a] person is an accomplice in the commission of *a crime* if, with knowledge that it will promote or facilitate the commission of *the crime*, he or she either: (1) solicits, commands, encourages, or requests another person to commit *the crime* or (2) aids or agrees to aid another person in planning or committing *the crime*." *Id.*

[2]In dissent from denial of rehearing en banc, Judge Callahan criticized the *Sarausad* majority for not paying the proper deference to the Washington Supreme Court's interpretation of Washington's accomplice liability statute under AEDPA. *Sarausad v. Porter*, 503 F.3d at 822. Judge Callahan stated "[w]hen a state statute or common law conflicts with the United States Constitution, we will declare the state law to be null and void, but we have no authority to alter or reinterpret state law." *Id.*

1    In addition, distinct from *Sarausad*, Robertson's jury instructions clearly established

2  that he could be found guilty of second degree felony murder based on a finding that he

3  acted with the specific intent of gross negligence when discharging a firearm that resulted in

4  death.  479 F.3d at 690.  Thus, there was no ambiguity that may have given rise to a

5  reasonable likelihood the jury misapplied Robertson's jury instructions, thereby relieving the

6  prosecution of the burden of proving every element of second degree felony murder beyond

7  a reasonable doubt.

8    Robertson asserts that the Ninth Circuit's opinion in *Suniga v. Bunell* supports his

9  argument that submission to the jury of the felony murder theory was legally invalid because

10  it was barred by the merger doctrine.  998 F.2d 664, 669 (9th Cir. 1993).  He claims that,

11  under *Suniga*, the jury instructions violated his due process rights by allowing a conviction

12  on a "non-existent legal theory."   In *Suniga*, the defendant was convicted of second degree

13  felony murder for the shooting death of his wife's alleged lover.  *Id.* at 665.  During the trial,

14  the prosecution did not rely upon a felony murder theory, rather it relied upon malice to

15  support a conviction.  *Id.* at 667.  The trial court instructed the jury on felony murder based

16  on felony assault with a deadly weapon.  *Id.*  The Ninth Circuit determined that, not only did

17  the trial court interject a theory of criminal liability into the case, it also allowed a conviction

18  based upon the non-existent legal theory of felony murder for assault with a deadly weapon

19  - a theory expressly overruled by the California Supreme Court in *Ireland*. *Id.* at 669.  The

20  Ninth Circuit in *Suniga* held that the instructional error was "so serious 'that the instruction

21  by itself so infected the entire trial that the resulting conviction violate[d] due process.'"  *Id.* at

22  670 (citing *Estelle*, 112 S.Ct. at 482).

23    Here, in contrast to *Suniga*, the prosecution in Robertson's case relied, at least in

24  part, on the felony murder theory for the conviction.  Additionally, unlike *Suniga*, the

25  California Supreme Court held, prior to Robertson's offense, that a violation of § 246.3 was

26  a felony inherently dangerous to human life and could serve as a predicate felony under the

27  felony murder rule.  *See Hansen*, 9 Cal. 4th at 308-311.  Further, unlike *Suniga*, Robertson

28  was on notice that the focus of merger doctrine analysis after *Hansen* was whether use of

an inherently dangerous felony "as the predicate felony supporting application of the felony-murder rule will [] elevate all felonious assaults to murder or otherwise subvert the legislative intent." *Id.* at 315. Thus, *Suniga* does not support Robertson's claim that the jury instructions violated his due process rights.

> **2.** **Robertson's Constitutional Rights were not Violated By the State's Failure to Prove Alleged Elements of Second Degree Murder**

>> a. *Robertson's Jury Instructions Were Proper Because Malice Was Not a Required Element*

Under established Supreme Court precedent, "[i]nstructions that allow a jury to convict without finding every element of the offense violate *In re Winship's* [397 U.S. at 364] requirement that 'every fact necessary to constitute the crime must be proven beyond a reasonable doubt.'" *Keating v. Hood*, 191 F.3d 1053, 1061 (9th Cir. 1999) (overruled on other grounds). In such instances, constitutional error is presumed, and the court must determine whether that error was harmless. *Id.* at 1061. However, no *Winship*-type case is found where the instructions do not omit any element of the charge against the defendant. *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000). To determine whether an element has been omitted, this court must accept the California Supreme Court's identification of the elements of the offense. *Solis*, 219 F.3d at 927.

Robertson argues that the jury was allowed to convict him without finding the necessary intent element - malice for second degree murder. However, the element of malice is not necessary for a finding of guilt under the second degree felony murder rule in California. *Hansen*, 9 Cal. 4th at 308.

Robertson's case is similar to *Solis v. Garcia*. In *Solis*, the federal habeas petitioner was found guilty of second degree murder. 219 F.3d at 927. The *Solis* petitioner argued that his Sixth Amendment right to a jury trial was violated because the jury instructions given did not instruct on the elements of the target crime that he was alleged to have committed

as an aider and abettor.[3]  *Id.*  Comparing the elements of the crime to the instructions given to the *Solis* petitioner's jury, the Ninth Circuit stated, "it is clear that the instructions were sufficient." *Id.* at 927.  The court then concluded, "[t]he instructions, taken directly from CALJIC, closely mirror each and every element of the crime of second degree murder under the doctrine of natural and probable consequences, as defined by California's highest court." *Id.*

Additionally, the *Solis* petitioner argued a violation of due process because the instructions allowed the jury to convict without finding that he acted with the requisite intent to aid and abet a murder. *Id.*  The Ninth Circuit disagreed, stating "that if the jury had believed [petitioner's] testimony, then it could not have found him guilty of aiding and abetting the target crime" *Id.*  Thus, "the guilty verdict unambiguously indicates that the jury concluded [petitioner] intended to encourage or facilitate the commission of the target crime." *Id.* at 928.  Robertson now makes a similar argument.  Similar to the *Solis* case, Robertson's jury was instructed on the requisite elements to find a violation of § 246.3 and the corresponding second degree felony murder doctrine, in accordance with CALJIC instructions.

Robertson also argues that the jury convicted him without finding the intent necessary for second degree murder.  As discussed above, malice is not necessary for a finding of guilt under the second degree felony murder rule.  Additionally, the jury instructions in this case required the jury to find that Robertson acted with gross negligence, the specific intent necessary to commit a violation of § 246.3.  Similar to *Solis*, if the jury believed Robertson's defense that he meant only to frighten the victims away, then it would not have found that he violated § 246.3, because, as the California Supreme Court noted on review of his case, the element of gross negligence would be absent.  *Solis*, 219 F.3d at 171.  Thus, Robertson has

---

[3] Solis was charged with the elements of the crime of second degree murder as follows: "(1) knowledge of the confederates unlawful purpose; (2) intent to commit, encourage, or facilitate the commission of any target crime; (3) aid, promotion, encouragement or instigation of the target crime; (4) commission by defendant's confederate of the charged crime; and (5) the offense committed by the confederate was a natural and probable consequence of the target crime that the defendant encouraged or facilitated." *Solis*, 219 F.3d at 927.

not established a violation of the Sixth Amendment or his due process rights based upon the trial court's failure to instruct the jury that it must find malice in order to convict him of second degree felony murder.

b.     *Independent/Collateral Purpose*

In his petition, Robertson also argues that "[t]he California Supreme Court [was] wrong in treating [his] intent to scare the victim as a felonious intent independent of the killing." *See* Petition at 14.  In support, Robertson notes that the jury was not instructed specifically to find that he shot the victim with an intent to scare him.  *Id.* at 14-15.

As noted above, the California Supreme Court was interpreting state law when it concluded that the grossly negligent discharge of a firearm did not merge with the second degree murder charge because there was evidence that Robertson possessed an independent or collateral purpose to scare the victim, who was burglarizing his vehicle.  For reasons already discussed, the question whether the California Supreme Court properly interpreted California law regarding the collateral purpose doctrine is *not* a cognizable federal habeas claim.  *See Little*, 449 F.3d at 1082.  However, to the extent that Robertson is actually arguing that there was insufficient evidence that he possessed an independent purpose, this may present a cognizable federal habeas claim and is addressed below.

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief.  *See Jackson v. Virginia*, 443 U.S. 307, 324, 321 (1979); *see, e.g., Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged); *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence found

insufficient to convict defendants of child abuse based on delay in seeking medical care for child).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *See id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir. 1985).

On habeas review, a federal court evaluating the evidence under *In re Winship* and *Jackson* should take into consideration all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas court need not confine its analysis to evidence presented by the state in its case-in-chief). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. *Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, *Jackson* does not permit a federal habeas court to revisit credibility determinations. *See id.* (credibility contest between victim alleging sexual molestation and defendant vehemently denying allegations of wrongdoing not a basis for revisiting jury's obvious credibility determination); *see also People of the Territory of Guam v. McGravey*, 14 F.3d 1344, 1346-47 (9th Cir. 1994) (upholding conviction for sexual molestation based entirely on uncorroborated testimony of victim).

Here, the California Supreme Court defined the independent felonious design test. It held that "use of the second degree felony-murder rule [is] appropriate when the purpose of the predicate felony was independent of or collateral to an intent to cause injury that would

result in death." *Robertson*, 34 Cal. 4th at 171. Applying this test, the court then found that Robertson could be convicted of second degree felony murder under the circumstances of this case because his "asserted underlying purpose was to frighten away the young men who were burglarizing his automobile." *Id.*

Robertson does not refute this factual characterization. Traverse to Answer 3:1-4 & 6:24-27. In fact, Robertson has previously admitted that he fired his gun in an attempt to scare the individuals robbing his car. R.T. at 634-635. At the hearing on Robertson's motion to exclude his confession to the police, Robertson testified that his purpose in shooting the gun was to frighten the young men away from his vehicle. R.T. at 86-87. Additionally, at the preliminary examination, the interviewing officer corroborated details of Robertson's recorded confession, wherein Robertson asserted his intention in shooting the gun was to frighten away the young men. C.T. at 55-62. At trial, Robertson did not testify in his defense. Instead, the prosecution played a tape and provided a transcript to the jury of his confession to the police. However, neither the taped confession nor the corresponding transcript are included in the record. Despite this omission, the record corroborates the California Supreme Court's determination regarding Robertson's admitted purpose.

Given Robertson's admission, the California Supreme Court's decision was reasonable since a jury could have rationally found that when Robertson shot the gun in the direction of the young men, he did so with the intent of frightening the individuals away from his car - a purpose independent of, or collateral to, the ensuing homicide. Therefore, the California Supreme Court's conclusion that there was sufficient evidence that Robertson had a collateral purpose was not contrary to, or an unreasonable application of, clearly established federal law; nor was it based on an unreasonable determination of the facts in light of the evidence presented.

**III. Robertson has not Established that the California Supreme Court's Holding was a Retroactive Judicial Expansion of the Second Degree Felony Murder Rule in Violation of Due Process**

Robertson also argues that by holding that a violation of § 246.3 does not merge with the resulting homicide, the California Supreme Court unforeseeably expanded the felony

murder doctrine.

**A.    Legal Standard**

"An unforeseeable judicial enlargement of a criminal statute, applied retroactively, violates the federal due process right to fair warning of what constitutes criminal conduct." *Clark v. Brown*, 450 F.3d 898, 911 (9th Cir. 2006) (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964)).   Under *Bouie* and subsequent cases, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997).   However, California's second degree felony murder rule is a common law doctrine. *Robertson*, 34 Cal. 4th at 166.   "[J]udicial alteration of a common law doctrine of criminal law violates the principle of fair warning, and hence must not be given retroactive effect, only where it is unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Rogers v. Tennessee*, 532 U.S. 451, 462 (2001) (internal quotations omitted).

**B.    Analysis**

Here, prior to Robertson's commission of the present offenses, the California Supreme Court in *Hansen* announced the merger rule with respect to violations of § 246.3. Under the rule announced in *Hansen*, it appears reasonable and foreseeable that at the time of his offenses, Robertson could be convicted of second degree felony murder based on a violation of § 246.3 that resulted in death.   Therefore, it is not "unexpected and indefensible" for the California Supreme Court to hold that the "merger" doctrine did not apply to Robertson's conduct. *Robertson*, 34 Cal. 4th at 169-173.

Robertson cites the Ninth Circuit's opinion in *Clark v. Brown*, for the proposition that the California Supreme Court's holding violated due process.   450 F.3d 898 (9th Cir. 2006). However, *Clark* is distinguishable.   In *Clark*, the petitioner set a fire in the home of his therapist. *Id.* at 902.   The *Clark* petitioner intended that the fire would force the therapist's family out of the house and enable him to kill the therapist's husband with a shotgun while the therapist witnessed the killing. *Id.*   The *Clark* petitioner's plan went awry and he

abandoned the shooting. *Id.* Ultimately, the therapist's husband died from burns sustained during the fire set by the petitioner. *Id.* A jury convicted the *Clark* petitioner of first degree murder for the homicide, attempted second degree murder of others within the house, and arson with a special circumstance, making him death-penalty eligible. *Id.*

On direct appeal to the California Supreme Court, the *Clark* petitioner challenged the special circumstance jury instruction, which required only that the murder have been committed while petitioner was engaged in the commission or attempted commission of arson. *Id.* at 903. The state supreme court held that the special circumstance jury instruction was proper and affirmed the conviction. *People v. Clark*, 50 Cal. 3d 583, 606-609 (Cal. 1990).

The *Clark* petitioner then sought federal habeas relief. The Ninth Circuit concluded that the California Supreme Court's decision in *People v. Clark* reinterpreted its earlier holding in *People v. Green*, 27 Cal. 3rd 1 (Cal. 1980), when it concluded that the *Clark* petitioner "was guilty of the special circumstance if he had 'independent, albeit concurrent, goals' of committing arson *and* killing [his therapist's husband]." *Clark*, 450 F.3d at 908 (quoting *Clark*, 50 Cal. 3d at 609). In support, the Ninth Circuit noted that the California Supreme Court in *Green* limited the felony murder special circumstance statute. It noted that "*Green* held that a felony whose 'sole object is *to facilitate* or conceal *the primary crime*' of murder is 'incidental,' and therefore does not qualify the defendant for the death penalty under the special circumstance statute." *Id.* at 905-906 (quoting *Green*, 27 Cal. 3d at 61) (emphasis in original). Additionally, the Ninth Circuit held that "[the petitioner] had no independent felonious intent within the meaning of *Green* because the arson was incidental to his primary intent to kill [his therapist's husband]." *Id.* at 907. Accordingly, the Ninth Circuit held "[the petitioner] was entitled to an instruction that he was not guilty of the special circumstance if the arson was a felony whose 'sole object [was] to facilitate . . . the primary crime of murder." *Id.* at 908 (quoting *Green*, 27 Cal. 3d at 61). The Ninth Circuit therefore ultimately concluded that the California Supreme Court's decision in *People v. Clark* represented a "retroactive application," which was "unexpected and indefensible by

34

1  reference to the law which had been expressed prior to the conduct in issue," thus violating

2  due process. *Id.* at 916 (internal quotations omitted).

3      In *Clark*, the state had relied on the California Supreme Court's decision in *People v.*

4  *Murtishaw*, 29 Cal. 3d 733, 752 (Cal. 1981), which held that the defendant's concurrent

5  objectives of murdering their victims and stealing their car was sufficient to support a

6  verdict of felony murder. *Clark*, 450 F.3d at 914. The state argued that the holding in

7  *Murtishaw* provided fair warning that the state supreme court would reinterpret it's holding

8  in *Green* in deciding *People v. Clark*. *Clark*, 450 F. 3d at 914. However, the Ninth Circuit

9  distinguished *Murtishaw* because it "involved the felony-murder rule rather than the felony-

10 murder special circumstance statute." *Id.* The Ninth Circuit noted that under California law,

11 the felony murder rule is significantly broader than the felony murder special circumstance

12 statute. *Id.* Relying on this difference, the Ninth Circuit held that *Murtishaw* did not

13 represent fair warning "that the California Supreme Court would expand *Green's* definition

14 of [the] felony-murder special circumstance in deciding [the petitioner's] case." *Id.*

15     Here, distinct from *Clark*, prior to Robertson's violation of § 246.3 and the resulting

16 homicide, the *Hansen* court established fair warning and notice that a grossly negligent

17 discharge of a firearm that results in a homicide can be punished under the felony murder

18 rule and that a violation of § 246.3 does not merge with a resulting homicide. 9 Cal. 4th at

19 316. Additionally, unlike *Clark*, Robertson challenges the California Supreme Court's

20 interpretation of the merger doctrine in the context of the second degree felony murder rule

21 rather than the felony murder special circumstance statute. Finally, *Hansen* defined the

22 second degree felony murder rule and merger doctrine, which is distinct from the felony

23 murder special circumstance statute addressed in *Clark*. *Clark*, 450 F.3d at 914. Thus,

24 *Clark* does not aid Robertson in establishing a due process violation for an unforeseeable

25 and retroactive judicial expansion in California of the second degree felony murder rule.

26                                 **CONCLUSION**

27     For the reasons discussed above, the court DENIES relief on Robertson's habeas

28 because the state appellate court's decision was neither contrary to, nor an unreasonable

1  application of, clearly established federal law; nor was it based on an unreasonable

2  determination of the facts in light of the evidence presented.  This order fully adjudicates

3  the petition listed at No. 1 of the clerk's docket for this case and terminates all other

4  pending motions.  The clerk shall close the file.

5

6  **IT IS SO ORDERED.**

7

8  Dated: January 3, 2008

9

10  _____
    PHYLLIS J. HAMILTON
    United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28